# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | Case No. 1:15-cv-6140 |
| Plaintiff, | COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES PURSUANT TO THE COMMODITY EXCHANGE ACT |
| v. | |
| GARY CREAGH, and WALL STREET PIRATE MANAGEMENT, LLC, | |
| Defendants. | |

Plaintiff U.S. Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.      SUMMARY

1.      From at least December 2011 through September 2013 (the "relevant period"), Wall Street Pirate Management, LLC ("WSPM"), by and through its managing member and sole employee Gary Creagh ("Creagh") (collectively the "Defendants"), made multiple false statements to the National Futures Association (the "NFA"), the self-regulatory organization for the U.S. futures industry, in statutorily required reports and during an NFA audit of WSPM in furtherance of NFA's official duties under the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1-23 (2012).

2.      Creagh, individually and as the agent of WSPM, falsely represented to the NFA that the Wall Street Pirate Fund, L.P. (the "WSPF" or "WSPF commodity pool"), a commodity pool WSPM operated, was not active during calendar year 2012 despite that WSPM accepted funds from participants in the WSPF commodity pool and actively traded commodity futures

contracts for the benefit of the WSPF commodity pool at an account in the pool's name at futures commission merchant (the "FCM") Interactive Brokers (the "Pool Trading Account") throughout 2012. As the sole person authorized to trade on behalf of WSPM, and the sole person who made hundreds of trades as the agent of WSPM, Creagh knew he personally and actively traded the Pool Trading Account on behalf of pool participants during the relevant period and knew his statements to the NFA were false.

3. Defendants' actions violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012), which makes it illegal for any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact in communications with the NFA.

4. Additionally, throughout the relevant period, WSPM, by and through its agent Creagh, failed to maintain required books and records and provide account statements and privacy notices to WSPF pool participants, in violation of Section 4n(3)(A) and (4) of the Act, 7 U.S.C. § 6n(3)(A), (4) (2012); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (with respect to conduct before January 2, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66323 (Nov. 2, 2012)) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2014) (with respect to conduct on or after February 19, 2013); Commission Regulation 4.22, 17 C.F.R. § 4.22 (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.22, 17 C.F.R. § 4.22 (2014) (with respect to conduct on or after November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (as amended by Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting from the Dodd-Frank Act, 77 Fed. Reg.

54355, 54358 (Sept. 5, 2012)) (with respect to conduct on or after November 5, 2012 and before January 2, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2013) (with respect to conduct on or after January 2, 2013 and before September 23, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2014) (with respect to conduct on or after September 23, 2013); Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012); and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

5.      Creagh's false statements to the NFA concealed that WSPM had not maintained the books and records or provided the account statements and notices to pool participants required by the Act and Commission Regulations.

6.      Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and to compel their compliance with the Act and Commission Regulations.  In addition, the Commission seeks civil monetary penalties, disgorgement, and such other equitable relief as the Court may deem necessary or appropriate.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8.      Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because the Defendants transacted business in the Southern District of New York, and Defendants' acts and practices in violation of the Act occurred within this District.

### III.        THE PARTIES

9.        Plaintiff **United States Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Commission Regulations promulgated thereunder.  The Commission maintains its principal office at 1155 21st Street NW, Washington, DC 20581.

10.        Defendant **Wall Street Pirate Management, LLC** is a Pennsylvania limited liability company with its principal place of business listed as Philadelphia, Pennsylvania. WSPM also regularly conducted business from offices in New York, New York.  WSPM was registered with the Commission as a commodity pool operator ("CPO") from December 2011 through September 2013.

11.        Defendant **Gary Creagh** is the sole managing member of WSPM and its only employee.  Creagh controls WSPM's operations, finances, accounts, and books and records, and he is the sole signatory on WSPM's bank account and sole person authorized to trade its commodity accounts on behalf of pool participants.  During the relevant period, Creagh resided and worked in both Philadelphia, Pennsylvania and New York, New York.  Creagh was registered with the Commission as an associated person ("AP") of WSPM throughout the relevant period.

### IV.        OTHER RELEVANT ENTITY

12.        **Wall Street Pirate Fund, L.P.** was a Delaware limited partnership.  WSPF was a single-advisor commodity pool that provided a means by which investors could engage in the buying and selling of commodity interests.  WSPM was the general partner and CPO of WSPF.

13.        The **National Futures Association** is a futures association registered with the Commission pursuant to Section 17 of the Act, 7 U.S.C. § 21 (2012).  Membership in the NFA is mandatory for all persons and entities conducting business with the public in the U.S. futures

- 4 -

industry, including CPOs and APs of CPOs.  Pursuant to its official duties as a registered futures association, the NFA has developed a body of rules to safeguard market integrity, protect investors from fraud, and help futures entities and their APs meet regulatory responsibilities. NFA members are subject to audits and investigations by the NFA to ensure compliance with NFA rules, the Act, and Commission Regulations.  Cooperation and candor by NFA members with NFA compliance and audit staff are critical to the NFA's ability to discharge its obligations as a registered futures association to, among other things, protect members of the public from persons or entities unlawfully soliciting customers, accepting customer orders, or exercising trading discretion on behalf of customers.

## V.      FACTS

### A.      Operation of the WSPF Commodity Pool

14.      On or about March 15, 2012, Creagh, acting as the agent of WSPM, opened a commodity trading account at the FCM Interactive Brokers in the name of the WSPF commodity pool.  WSPM was identified as the CPO of the pool, and Creagh was identified as the sole principal of WSPM authorized to effect transactions for the benefit of the Pool Trading Account.

15.      On or about March 15, 2012, Creagh invested $150,000 with WSPM to participate in the WSPF commodity pool.  On or about that same day, Creagh, acting as the agent of WSPM as its CPO, deposited the $150,000 into a WSPM account at TD Bank and then transferred via wire the $150,000 into the Pool Trading Account.  Creagh opened the TD Bank account in the name of WSPM.

16.      At all times relevant hereto, Creagh was the sole employee of WSPM, the sole managing member of WSPF, the sole signatory on the WSPM bank account at TD Bank, and the sole person authorized to trade the commodity trading account carried in the name of WSPF at the FCM Interactive Brokers.  Accordingly, at all times relevant hereto Creagh had personal

knowledge of the total amount of funds accepted by the pool from participants, the disposition of said funds, as well as the number of trades effected on behalf of pool participants in the pool's commodity trading account and the date each trade was made.

17.     Immediately after Creagh transferred the $150,000 into the Pool Trading Account, WSPM, by and through Creagh, began actively operating the WSPF commodity pool by buying and selling commodity futures contracts in the Pool Trading Account for the benefit of the WSPF commodity pool, as described below.

18.     On or about April 10, 2012, an acquaintance of Creagh invested $50,000 with Defendants to participate in the WSPF commodity pool.  On or about May 2, 2012, WSPM, by and through its agent Creagh, deposited these funds into the WSPM account at TD Bank and then transferred the funds by wire into the Pool Trading Account.

19.     On or about May 30, 2012, another acquaintance of Creagh invested $50,000 with Defendants to participate in the WSPF commodity pool.  On or about July 12, 2012, WSPM, by and through its agent Creagh, deposited the $50,000 into the WSPM account at TD Bank and then transferred the $50,000 by wire into the Pool Trading Account.

20.     All of the funds transferred into the Pool Trading Account were funds belonging to the WSPF commodity pool participants and were used to effect commodity futures transactions.

21.     As reflected in the daily activity statements for the Pool Trading Account, WSPM, by and through its agent Creagh, placed hundreds of commodity futures trades for the benefit of the pool throughout calendar year 2012.

**B.**     **False Statements Made to the NFA**

22.     In furtherance of its official duties under the Act, the NFA conducts periodic audits and examinations of NFA members as a means of monitoring and assuring compliance with NFA rules, the Act, and Commission Regulations.

23.     In addition, pursuant to NFA rules, the Act, and Commission Regulations, CPOs are required to file with the NFA quarterly financial reports for each pool the CPO operates. CPOs may file these quarterly reports electronically with the NFA using the NFA's EasyFile system (the "EasyFile"). One of the prompts for an individual effecting a report using EasyFile is whether the pool at issue was active or not during the reporting period.

24.     During the relevant period, WSPM, by and through its agent Creagh, filed four false written quarterly reports with the NFA and thereafter made false oral statements to the NFA during an NFA audit of WSPM.

25.     On or about May 31, 2012, WSPM, by and through its agent Creagh, filed with the NFA through EasyFile a false quarterly report for the quarter ending March 30, 2012.

26.     Despite that between March 15, 2012 and March 31, 2012, WSPM accepted funds from a pool participant and traded multiple commodity futures contracts in the Pool Trading Account for the benefit of that pool participant, WSPM, by and through its agent Creagh, falsely represented to the NFA that the WSPF commodity pool did not operate during that period. Creagh knew this statement was false as he knew WSPM had accepted WSPF pool participant funds and he actively traded commodity futures contracts as the agent of WSPF during the reporting period.

27.     On about September 12, 2012, WSPM, by and through its agent Creagh, filed a second false quarterly report with the NFA through EasyFile.

28.     Despite that between April 1, 2012 and June 30, 2012, WSPM accepted $100,000 from two pool participants and traded multiple commodity futures contracts in the Pool Trading Account on behalf of the WSPF commodity pool, WSPM, by and through its agent Creagh, falsely represented to the NFA that the WSPF commodity pool did not operate during that period.  Creagh knew this statement was false as he knew WSPM had accepted WSPF pool participant funds and he had actively traded commodity futures contracts as the agent of WSPF during the reporting period.

29.     On or about February 12, 2013, WSPM, by and through its agent Creagh, filed additional false reports with NFA through EasyFile.

30.     Despite that WSPM traded multiple commodity futures contracts in the Pool Trading Account on behalf of WSPF between July 1, 2012 and December 31, 2012, WSPM, by and through its agent Creagh, falsely represented to the NFA that the WSPF commodity pool did not operate during that period.  Creagh knew this statement was false as he had actively traded commodity futures contracts on behalf of WSPF during the reporting period.

31.     On June 12, 2014, during testimony under oath before the Commission, Creagh admitted filing false quarterly reports with NFA.

32.     Subsequent to the filing of these false reports, on March 4, 2013, the NFA conducted an unannounced on-site audit of WSPM, at its offices in New York, New York, to ensure the firm was in compliance with its recordkeeping and financial requirements.

33.     During the audit, Creagh, individually and as the agent and managing member of WSPM, falsely represented to the NFA orally that WSPF was not active during calendar year 2012.  Creagh knew these statements were false as he knew WSPM had accepted funds from

prospective pool participants and he actively traded commodity futures contracts in the Pool

Trading Account on behalf of WSPF throughout calendar year 2012.

34.     On June 12, 2014, during testimony under oath before the Commission, Creagh

admitted that the WSPF commodity pool was active in 2012.  Creagh also admitted that WSPM

accepted funds from WSPF pool participants and traded commodity futures contracts on behalf

of WSPF throughout 2012.

**C.     Failure to Keep Books and Records, and Provide Account Statements and Privacy
Notices to Pool Participants**

35.     As described in more detail below, the Act and Commission Regulations require

registered CPOs to maintain certain books and records concerning the CPO and each pool it

operates, and provide periodic account statements and privacy notices to pool participants.

36.     At all times during the relevant period, the WSPF commodity pool held net assets

less than $500,000.

37.     Despite operating the WSPF commodity pool during the relevant period by

among other things, accepting pool participant funds and trading commodity futures on behalf of

the pool, WSPM failed to maintain the books and records required by Commission Regulations.

38.     Specifically, WSPM did not maintain, among other books and records:  (1) a

general ledger, (2) statement of financial condition, (3) statement of income/loss, and/or (4) a

cash receipts and disbursements journal.

39.     On June 12, 2014, during testimony under oath before the Commission, Creagh

admitted that the WSPF commodity pool, which WSPM operated, did not maintain these

required records.

40.     Additionally, despite operating the WSPF commodity pool during the relevant period, WSPM failed to prepare and distribute periodic accounts statements to the WSPF commodity pool participants, as required by the Act and Commission Regulations.

41.     Specifically, WSPM failed to provide pool participants with at least quarterly account statements covering the ten month period during which WSPM operated the WSPF pool in 2012, and a timely annual report for 2012.

42.     On June 12, 2014, during testimony under oath before the Commission, Creagh admitted that during the life of the WSPF commodity pool, he never provided pool participants monthly or quarterly account statements.

43.     Furthermore, WSPM failed to provide to the WSPF pool participants the privacy notices required by Commission Regulations.  Specifically, WSPM failed to notify pool participants of the categories of nonpublic personal information that WSPM collected and WSPM's policies and practices with respect to protecting the confidentiality and security of that information, as required by Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012), and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

44.     On June 12, 2014, during testimony under oath before the Commission, Creagh admitted that WSPM did not provide this required information to the WSPF pool participants.

45.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices.

**VI.        STATUTORY AND REGULATORY VIOLATIONS**

**COUNT I**

**FALSE STATEMENTS TO THE NFA**
**(VIOLATIONS OF 7 U.S.C. § 13(a)(4) (2012))**

46.     The allegations in the foregoing paragraphs are incorporated herein by reference.

47.     Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012), makes it unlawful for:

> Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under this Act acting in furtherance of its official duties under this Act.

48.     Creagh, individually and as the agent of WSPM, willfully made materially false statements to the NFA, and concealed material information from the NFA, in statutorily required reports and during oral communications with NFA staff during an NFA audit in furtherance of the NFA's official duties under the Act, in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012).

49.     Specifically, as alleged above, Creagh, individually and as the agent of WSPM, falsely stated to NFA staff during an NFA audit and in statutorily required reports filed with the NFA that the WSPF commodity pool did not operate during calendar year 2012.

50.     Creagh knew that these material statements were false as he personally accepted funds from participants in the WSPF commodity pool as the agent of WSPF, and he actively traded commodity futures contracts in the Pool Trading Account on behalf of WSPF during 2012.

51.     By making false statements to the NFA, and by concealing trading activity from the NFA, Creagh, individually and as the agent of WSPM, willfully falsified, concealed, and covered up by trick, scheme, or artifice material facts and made false writings or documents knowing the same to contain false statements, in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012).

52.     Each of the false statements Creagh made to the NFA occurred within the scope of his office or employment with WSPM.  Therefore, WSPM is liable for those false statements pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2014).

53.     Moreover, at all times pertinent to this Complaint, Creagh controlled WSPM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting WSPM's violations of Section 9(a)(4) of the Act.  Therefore, Creagh is liable for WSPM's violations of Section 9(a)(4) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

54.     Each false, fictitious, or fraudulent statement, representation, or omission, and each act of concealment, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012).

## COUNT II

### FAILURE TO MAINTAIN BOOKS AND RECORDS
### (VIOLATIONS OF 7 U.S.C. § 6n(3)(A) (2012) AND 17 C.F.R. § 1.31 (2012))

55.     The allegations in the foregoing paragraphs are incorporated herein by reference.

56.     Section 4n(3)(A) of the Act, 7 U.S.C. § 6n(3)(A) (2012), requires every registered CPO to maintain books and records as proscribed by the Commission.

57.     Commission Regulation 1.31 provides that all books and records required to be maintained by the Act or Commission Regulations must be kept for a period of five years.  17 C.F.R. § 1.31 (2012) (with respect to conduct before January 2, 2013); 17 C.F.R. § 1.31 (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66323 (Nov. 2, 2012)) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); 17 C.F.R. § 1.31 (2014) (with respect to conduct on or after February 19, 2013).

58.     Commission Regulation 4.23 requires every registered CPO to maintain certain books and records concerning the commodity pool and the CPO, including, but not limited to: (1) an itemized daily record of each commodity interest transaction for the pool; (2) a journal of original entry or other equivalent record showing all receipts and disbursements of money, securities, and other property; (3) a subsidiary ledger or other equivalent record for each participant in the pool showing the participant's name and address and all funds, securities, and other property that the pool received from or distributed to the participant; (4) adjusting entries and any other records of original entry or their equivalent forming the basis of entries in any ledger; (5) a general ledger or other equivalent record containing details of all asset, liability, capital, income, and expense accounts; (6) copies of each confirmation of a commodity interest transaction of the pool, each purchase and sale statement, and each monthly statement for the pool received from a FCM or retail foreign exchange dealer (hereinafter the "RFED"); (7) cancelled checks, bank statements, journals, ledgers, invoices, computer generated records, and all other records, data, and memoranda prepared or received in connection with the operation of the pool; (8) all documents distributed by the CPO to pool participants; (9) a Statement of Financial Condition; (10) a Statement of Income or Loss; and (11) a manually signed copy of each Account Statement and Annual Report provided pursuant to Commission Regulations 4.7(b), 4.12(b), or 4.22 and records of key financial balances submitted to the NFA for each commodity pool Annual Report, which records must clearly demonstrate how the key financial balances were compiled from the Annual Report.  17 C.F.R. § 4.23 (2012) (with respect to conduct before November 5, 2012); 17 C.F.R. § 4.23 (2012) (as amended by Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting from the Dodd-Frank Act, 77 Fed. Reg. 54355, 54358 (Sept. 5, 2012)) (with respect to conduct on or after

November 5, 2012 and before January 2, 2013); 17 C.F.R. § 4.23 (2013) (with respect to conduct

on or after January 2, 2013 and before September 23, 2013); 17 C.F.R. § 4.23 (2014) (with

respect to conduct on or after September 23, 2013).

59.     The records required to be maintained concerning the CPO, include, but are not

limited to:  (1) an itemized daily record of each commodity interest transaction of the CPO and

each principal thereof, showing the transaction date, quantity, commodity interest, and, as

applicable, price or premium, delivery month or expiration date, whether a put or a call, strike

price, underlying contract for future delivery or underlying physical, the FCM or RFED carrying

the account and the introducing broker, if any, whether the commodity interest was purchased,

sold, exercised or expired, and the gain or loss realized; (2) each confirmation of a commodity

interest transaction, each purchase and sale statement, and each monthly statement furnished by a

FCM or RFED relating to any personal accounts of the CPO or any of its principals; and (3) the

books and records of all other transactions in all other activities in which the pool operator

engages.  Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (with respect to conduct before

November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (as amended by

Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations

Resulting from the Dodd-Frank Act, 77 Fed. Reg. 54355, 54358 (Sept. 5, 2012)) (with respect to

conduct on or after November 5, 2012 and before January 2, 2013); Commission Regulation

4.23, 17 C.F.R. § 4.23 (2013) (with respect to conduct on or after January 2, 2013 and before

September 23, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2014) (with respect to

conduct on or after September 23, 2013).

60.     During the relevant period, WSPM failed to maintain for the WSPF commodity

pool required books and records, including, but not limited to:  (1) a general ledger, (2) statement

of financial condition, (3) statement of income/loss, and (4) a cash receipts and disbursements

journal.  Accordingly, WSPM violated Section 4n(3)(A) of the Act, 7 U.S.C. § 6n(3)(A) (2012);

Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (with respect to conduct before January 2,

2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (as amended by Adaptation of

Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66323 (Nov. 2, 2012)) (with respect to

conduct on or after January 2, 2013 and before February 19, 2013); Commission Regulation

1.31, 17 C.F.R. § 1.31 (2014) (with respect to conduct on or after February 19, 2013);

Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (with respect to conduct before November

5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (as amended by Amendments to

Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting from the

Dodd-Frank Act, 77 Fed. Reg. 54355, 54358 (Sept. 5, 2012)) (with respect to conduct on or after

November 5, 2012 and before January 2, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23

(2013) (with respect to conduct on or after January 2, 2013 and before September 23, 2013); and

Commission Regulation 4.23, 17 C.F.R. § 4.23 (2014) (with respect to conduct on or after

September 23, 2013).

61.     At all times pertinent to this Complaint, Creagh controlled WSPM, directly or

indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts

constituting WSPM's violations of the Act and Commission Regulations.  Therefore, Creagh is

liable for WSPM's violations of the Act and Commission Regulations, pursuant to Section 13(b)

of the Act, 7 U.S.C. § 13c(b) (2012).

62.     Each failure to maintain required records, including but not limited to those

alleged herein, is alleged as a separate and distinct violation of, as applicable, Section 4n(3)(A)

of the Act, 7 U.S.C. § 6n(3)(A) (2012); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012)

(with respect to conduct before January 2, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66323 (Nov. 2, 2012)) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2014) (with respect to conduct on or after February 19, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (as amended by Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting from the Dodd-Frank Act, 77 Fed. Reg. 54355, 54358 (Sept. 5, 2012)) (with respect to conduct on or after November 5, 2012 and before January 2, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2013) (with respect to conduct on or after January 2, 2013 and before September 23, 2013); and Commission Regulation 4.23, 17 C.F.R. § 4.23 (2014) (with respect to conduct on or after September 23, 2013).

## COUNT III

### FAILURE TO ISSUE ACCOUNT STATEMENTS AND ANNUAL REPORT (VIOLATIONS OF 7 U.S.C. § 6n(4) (2012) AND 17 C.F.R. § 4.22 (2012))

63.     The allegations in the foregoing paragraphs are incorporated herein by reference.

64.     Section 4n(4) of the Act, 7 U.S.C. § 6n(4) (2012), requires every CPO to regularly furnish an account statement to each pool participant.

65.     Commission Regulation 4.22(a) and (b) requires every registered CPO, operating a pool with net assets less than $500,000, to at least quarterly distribute to each pool participant an Account Statement, which shall be presented in the form of a Statement of Operations and a Statement of Changes in Net Assets, for the prescribed period.  17 C.F.R. § 4.22 (2012) (with respect to conduct before November 5, 2012); 17 C.F.R. § 4.22 (2014) (with respect to conduct on or after November 5, 2012).

66.     The portion of the Account Statement which must be presented in the form of a Statement of Operations must separately itemize the following information about the operation of the pool during the reporting period:  (i) the total amount of realized net gain or loss on commodity interest positions liquidated; (ii) the change in unrealized net gain or loss on commodity interest positions; (iii) the total amount of net gain or loss from all other transactions in which the pool engaged; (iv) the total amount of all management fees; (v) the total amount of all advisory fees; (vi) the total amount of all brokerage fees; (vii) the total amount of other fees for commodity interest and other investment transactions; and (viii) the total amount of all other expenses incurred or accrued by the pool.  Commission Regulation 4.22(a)(1)(i)-(viii), 17 C.F.R. § 4.22(a)(1)(i)-(viii) (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.22(a)(1)(i)-(viii), 17 C.F.R. § 4.22(a)(1)(i)-(viii) (2014) (with respect to conduct on or after November 5, 2012).

67.     The portion of the Account Statement which must be presented in the form of a Statement of Changes in Net Assets must separately itemize the following information about the operation of the pool during the reporting period:  (i) the net asset value of the pool as of the beginning of the reporting period; (ii) the total amount of additions to the pool, whether voluntary or involuntary; (iii) the total amount of withdrawals from and redemption of participation units in the pool, whether voluntary or involuntary; (iv) the total net income or loss of the pool; (v) the net asset value per outstanding participation unit in the pool as of the end of the reporting period; and (vi) the total value of the participant's interest or share in the pool as of the end of the reporting period.  Commission Regulation 4.22(a)(2)(i)-(v), 17 C.F.R. § 4.22(a)(2)(i)-(v) (2012) (with respect to conduct before November 5, 2012); Commission

Regulation 4.22(a)(2)(i)-(v), 17 C.F.R. § 4.22(a)(2)(i)-(v) (2014) (with respect to conduct on or after November 5, 2012).

68.     Subject to two exceptions that are not applicable to WSPM, each Account Statement required to be distributed to pool participants by CPOs must be distributed within 30 calendar days after the last date of the reporting period covered by the Account Statement. Commission Regulation 4.22(a)(1), 17 C.F.R. § 4.22 (a)(1)(2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.22(a)(1), 17 C.F.R. § 4.22(a)(1) (2014) (with respect to conduct on or after November 5, 2012).

69.     In addition, Commission Regulation 4.22(c) requires each CPO to distribute to each pool participant an Annual Report, and also electronically submit a copy of the Annual Report to the NFA pursuant to the electronic filing procedures of the NFA, within ninety (90) calendar days after the end of the pool's fiscal year or the permanent cessation of trading, whichever is earlier.  17 C.F.R. § 4.22(c) (2012) (with respect to conduct before November 5, 2012); 17 C.F.R. § 4.22(c) (2014) (with respect to conduct on or after November 5, 2012).

70.     The Annual Report must be affirmed pursuant to Commission Regulation 4.22(h), and must contain the following:  (1) the net asset value of the pool as of the end of each of the pool's two preceding fiscal years; (2) the net asset value per outstanding participation unit in the pool as of the end of each of the pool's two preceding fiscal years, or the total value of the participant's interest or share in the pool as of the end of each of the pool's two preceding fiscal years; (3) a Statement of Financial Condition as of the close of the pool's fiscal year and preceding fiscal year; (4) Statements of Operations, and Changes in Net Assets; and (5) appropriate footnote disclosure and such further material information as may be necessary to make the required statements not misleading.  Commission Regulation 4.22(c)(1)-(5), 17 C.F.R.

§ 4.22(c)(1)-(5) (2012) (with respect to conduct before November 5, 2012); Commission

Regulation 4.22(c)(1)-(5), 17 C.F.R. § 4.22(c)(1)-(5) (2014) (with respect to conduct on or after

November 5, 2012).

71.     As alleged above, WSPM failed to provide participants in the WSPF commodity

pool with (1) Account Statement(s) covering any of the ten months it operated during calendar

year 2012, and (2) a timely Annual Report covering its operations for calendar year 2012.

Accordingly, WSPM violated Section 4n(4) of the Act, 7 U.S.C. § 6n(4) (2012); Commission

Regulation 4.22, 17 C.F.R. § 4.22 (2012) (with respect to conduct before November 5, 2012);

and Commission Regulation 4.22, 17 C.F.R. § 4.22 (2014) (with respect to conduct on or after

November 5, 2012).

72.     At all times pertinent to this Complaint, Creagh controlled WSPM, directly or

indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts

constituting WSPM's violations of the Act and Commission Regulations.  Therefore, Creagh is

liable for WSPM's violations of the Act and Commission Regulations, pursuant to Section 13(b)

of the Act, 7 U.S.C. § 13c(b) (2012).

73.     Each failure to issue required Account Statement(s) and Annual Report to pool

participants, including but not limited to those alleged herein, is alleged as a separate and distinct

violation of, as applicable, Section 4n(4) of the Act, 7 U.S.C. § 6n(4) (2012); Commission

Regulation 4.22, 17 C.F.R. § 4.22 (2012) (with respect to conduct before November 5, 2012);

and Commission Regulation 4.22, 17 C.F.R. § 4.22 (2014) (with respect to conduct on or after

November 5, 2012).

## COUNT IV

### FAILURE TO ISSUE REQUIRED PRIVACY NOTICES
### (VIOLATIONS OF 17 C.F.R. § 160.4 (2014))

74.     The allegations in the foregoing paragraphs are incorporated herein by reference.

75.     Commission Regulation 160.4, 17 C.F.R. § 160.4 (2014), requires every registered CPO to provide an initial privacy notice to each of its customers when the customer provides funds for an interest in a commodity pool.

76.     The required initial privacy notice must include, among other information:  (1) the categories of nonpublic personal information that the CPO collects, and (2) the CPO's policies and practices with respect to protecting the confidentiality and security of that information. Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012); Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

77.     WSPM did not provide to participants in the WSPF commodity pool notice of the categories of nonpublic personal information that WSPM collected or WSPM's policies and practices with respect to protecting the confidentiality and security of that information. Accordingly, WSPM violated Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012), and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

78.     At all times pertinent to this Complaint, Creagh controlled WSPM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting WSPM's violations of Commission Regulations.  Therefore, Creagh is liable for WSPM's violations of Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012), and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014)

(with respect to conduct on or after January 1, 2012), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

79. Each failure to provide the required privacy notices, including but not limited to those alleged herein, are alleged as separate and distinct violations of Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012), and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

### VII.        RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A. An order finding that Defendants violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012); Section 4n(3)(A) and (4) of the Act, 7 U.S.C. § 6n(3)(A), (4) (2012); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (with respect to conduct before January 2, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66288, 66323 (Nov. 2, 2012)) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); Commission Regulation 1.31, 17 C.F.R. § 1.31 (2014) (with respect to conduct on or after February 19, 2013); Commission Regulation 4.22, 17 C.F.R. § 4.22 (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.22, 17 C.F.R. § 4.22 (2014) (with respect to conduct on or after November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (with respect to conduct before November 5, 2012); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2012) (as amended by Amendments to Commodity Pool Operator and Commodity Trading Advisor Regulations Resulting from the Dodd-Frank Act, 77 Fed. Reg. 54355, 54358 (Sept. 5, 2012)) (with respect to conduct on or after November 5, 2012 and before January 2, 2013); Commission

Regulation 4.23, 17 C.F.R. § 4.23 (2013) (with respect to conduct on or after January 2, 2013 and before September 23, 2013); Commission Regulation 4.23, 17 C.F.R. § 4.23 (2014) (with respect to conduct on or after September 23, 2013); Commission Regulation 160.6, 17 C.F.R. § 160.6 (2011) (with respect to conduct before January 1, 2012); and Commission Regulation 160.6, 17 C.F.R. § 160.6 (2014) (with respect to conduct on or after January 1, 2012).

B.      An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of Sections 9(a)(4), 4n(3)(A), and (4) of the Act, 7 U.S.C. §§ 13(a)(4), 6n(3)(A), (4) (2012), and Commission Regulations 1.31, 4.22, 4.23, and 160.6, 17 C.F.R. §§ 1.31, 4.22, 4.23, 160.6 (2014);

C.      An order of permanent injunction prohibiting Defendants, and any of their agents, servants, employees, successors, assigns, attorneys, and persons acting in active concert or participation with Defendants, including any successor thereof, from, directly or indirectly:

a.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2014)) for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

- 22 -

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2014)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014).

D.      An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices constituting violations of the Act and Commission Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.      An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer or pool participant whose funds any Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Commission Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.      An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any customer or pool participant whose funds any Defendant received as a result of the acts and practices constituting violations of the Act and Commission Regulations, as described herein;

G.      An order directing Defendants, as well as any successors thereof, to pay a civil

monetary penalty, plus post-judgment interest, for each violation of the Act and Commission

Regulations described herein, in the amount of the greater of:  (i) $140,000 for each violation

committed; or (ii) triple Defendants' monetary gain for each violation committed;

H.      An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412 (2012); and

I.      An order directing such further relief as the Court deems proper.


Dated: August 5, 2015                          Respectfully submitted,

                                               **U.S. COMMODITY FUTURES TRADING
                                               COMMISSION**

                                               By:  ___s/ Jonah E. McCarthy_____
                                               Jonah E. McCarthy (SDNY Bar No. JM1977)
                                               Timothy J. Mulreany (*pro hac vice* application to be
                                               submitted)
                                               U.S. Commodity Futures Trading Commission
                                               Division of Enforcement
                                               1155 21st Street NW
                                               Washington, DC 20581
                                               Tel:  (202) 418-5000
                                               Fax:  (202) 418-5538
                                               tmulreany@cftc.gov
                                               jmccarthy@cftc.gov

- 24 -